IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

JERRY AND GEORGIA MCGONIGLE,          )
                                      )
                                      )
          Defendants/Third            )          CIVIL ACTION
          -Party Plaintiffs           )
v.                                    )          No.  10-1273-MLB
                                      )
                                      )
ASTLE REALTY, et al.                  )
                                      )
          Third Party Defendants.)
_____)


MEMORANDUM DECISION

**I.   INTRODUCTION**

This lawsuit arises out of a small-town real estate transaction which expanded to include several parties other than just the sellers, buyers and real estate professionals involved.  Over time, some of the parties resolved their various claims, leaving those by and between the buyers and the real estate professionals.  These were tried to the court on April 23, 24 and 25, 2013.  This decision represents the findings of fact and conclusions of law resulting therefrom.  Fed. R. Civ. P. 52(a).

**II.  FINDINGS OF FACT**[1]

In 1959, the Panorama Dam was built by the Soil Conservation Service now on land bordering Lakeview Road in Hutchinson, Kansas. The dam is an earthen structure and is currently classified as a size 2, class c (high) hazard dam.  The dam is 14.6 feet high at the top

---

[1] The facts set forth in this section consist of a general overview of the facts of this case.  Additional facts will be discussed, where appropriate, throughout the decision.

and the drainage area of the dam is 414 acres of water. The water retention area of the lake is approximately 5 acres. V a r i o u s documents and trial exhibits refer to Panorama Dam, Panorama Lake Dam and/or Panorama Lake. This suggests that persons living in and around Hutchinson would be familiar with the dam or lake by one or more of those names. This would seem especially true of owners of the property and persons in the real estate business. At the trial, there was considerable testimony about whether the dam was visible or recognizable as a dam, as opposed to something else, yet no witness was asked whether they had ever heard of Panorama Dam, Panorama Lake Dam or Panorama Lake before this litigation ensued. The court finds this odd, especially given the principal parties involved, all of whom are long-time residents of Hutchinson.

In 1977, Bill Rowland, June Rich and Dan and Kathy Rich[2] built a house on the land where the dam is located. They entered into an agreement with the City of Hutchinson which granted the City an easement on their property in order to perform improvements on the dam which were paid for by the City. The agreement also required the Riches to maintain the dam in the same condition after the improvements were made. In 1979, Dan Rich and others, sought to make modifications to the dam. The Riches submitted a plan and it was approved by the City's chief engineer.

On January 27, 1981, the Riches entered into another agreement with the City (referred to as "agreement" or "1981 agreement"). The agreement stated, in part, as follows:

---

[2] June and Kathy Rich are now deceased.

-2-

2.    Rich shall perform the following work, at their sol expense, upon Panorama Dam:

a.    All grubbing on Panorama Dam.  For purposes of this Agreement, "grubbing" shall mean removal of trees under six (6) inches in diameter, including the root system thereof.  All trees to be so removed shall be marked for identification by the City.  All grubbing shall be accomplished in accordance with the specifications contained in Attachment 1 hereto.
b.    Removal from Panorama Dam of all trees in excess of six (6) inches in diameter.  All trees to be so removed shall be marked for identification by the City. All such tree removal shall be accomplished by cutting the tree and poisoning the stump, all in accordance with the specifications contained in Attachment 1 hereto.

(Exh. 412 at 1).  The agreement was filed with the Reno County Register of Deeds.

In March 1981 and January 1982, letters were sent to Dan Rich concerning his failure to follow through with his part of the agreement.  The City informed Rich that it would take action and complete the clearing of vegetation and large trees and assess the cost against the property.  Rich never cleared the vegetation and large trees in 1982 or at any time thereafter.  The City did not take any independent action to remove the trees and vegetation.

In 1997 and again in 1999, the dam was inspected by Leonard Bristow, a civil engineer with the Kansas Department of Water Resources ("DWR").  In 1997, Bristow submitted a report finding that the dam was not in compliance with the plan which had been submitted in 1979.  Bristow sent a letter to Dan Rich informing him that the dam was not in compliance and included recommendations for work that needed to be completed in order for the dam to be in compliance with Kansas law.  The letter informed Rich that he needed to take action in 60 days.  Rich, however, did not follow through with the DWR

-3-

recommendations.  The DWR did not have any further contact with Rich until 1999.

On April 19, 1999, Bristow contacted Dan Rich and received permission to go on his property to inspect the dam.[3]  On September 13, 1999, Bristow sent a letter to the Riches and informed them that the dam was in violation of the Obstruction in Streams Act.  The letter included a consent order to be signed by the Riches.  The order stated that the Riches would obtain the services of an engineer to prepare plans for the dam and that changes and modifications would be done in accordance with a permit issued by the chief engineer of the DWR.  The consent order was never signed by the Riches.[4]  The DWR did not take any further action or reinspect the dam.

In November 1999, the Riches obtained a title commitment by Old Republic.[5]  The title policy did not disclose the agreement.

In May 2008, Dan and Mary Beth Rich approached Karen Gilliland, a real estate broker for Astle Realty, about listing their home for sale.  Gilliland began her career in real estate in 1982 and has been friends with the Riches for several years.  Gilliland met with Dan Rich at the property prior to listing it for sale.  While walking the property with Gilliland, Rich stated that there was a dam on the

---

[3] Rich testifed that this conversation did not take place.  The court, however, finds the documentation of the call and Bristow's testimony to be credible.  Rich was not a credible witness on some material issues.

[4] Rich testified that he did not receive Bristow's letters sent in 1997 and 1999.  The letters, however, were not returned to Bristow and they were addressed to Rich's home address.

[5] There was no evidence introduced at trial concerning the reason for the issuance of the 1999 title policy.

-4-

property and he had an agreement with the City to maintain the dam. Rich informed Gilliland that he did not have a copy of the agreement but that it was recorded. Rich further told Gilliland that there had never been any issues concerning the agreement. Gilliland told Rich that they needed to disclose all the information regarding the dam.

On May 6, 2008, the Riches completed the sellers' property disclosure statement. Gilliland wrote the address on the disclosure but did not fill out any other portion. Gilliland does not recall going over the disclosure with the Riches or answering any questions regarding the disclosure but it was her practice to review the disclosure after it was completed. The disclosure did not list the dam or the agreement. The disclosure also failed to disclose treatments for insects that had been completed by the Riches on several occasions.[6]

On May 20, Gilliland met with the Riches and entered into a formalized contract to list the property. Gilliland and the Riches signed an exclusive contract which lists Gilliland as a transaction broker[7] in the sale and entitles her to a five percent fee from the sale. The contract states that Gilliland would comply with the Brokerage Relationships in Real Estate Transactions Act (BRRETA) and that she would disclose all "adverse material facts actually known." (Exh. 429). Gilliland's practice is to disclose any adverse material

---

[6] Gilliland was not aware that there had been pest treatments on the property and there is no claim concerning the Rich's failure to disclose the past treatments.

[7] K.S.A. 58-30,102(u) states: "Transaction broker means a broker who assists one or more parties with a real estate transaction without being an agent or advocate for the interests of any party to such transaction. The term includes the broker's affiliated licensees."

facts in writing.[8]  Gilliland listed the property on the MLS without disclosing the existence of the dam or the agreement on the listing.

Jerry McGonigle drove down Lakeview Road and saw the property was for sale.  He stopped for a few minutes and observed all the trees on the property.  McGonigle told his wife, Georgia, about the property and they both drove by to look at the property but did not go inside the home.  The McGonigles then contacted Terry Brigman, a real estate agent with Astle.  Jerry McGonigle told Brigman that he and his wife had been to the property and would like to see the inside of the house.  Brigman scheduled a showing.

Brigman visited the property on two occasions with the McGonigles.  Dan Rich was at the property on one occasion and spoke with Brigman and Jerry McGonigle but did not walk the property with them.  Rich did not mention the dam or the agreement when Brigman was at the property.  On the second visit, Brigman recalls pointing out the earth structure to Jerry McGonigle.  However, Brigman does not recall what he called it but believes that he said that it was an embankment.  Brigman and Jerry McGonigle did not walk to the dam because there were numerous trees on the dam and it was difficult to enter that area.  Brigman and Jerry McGonigle did drive south on Lakeview, the street next to the dam, and viewed the additional acreage for sale south of the home.  Brigman and Jerry McGonigle did not walk on the property south of the home but viewed it from the street.  Brigman and Jerry McGonigle also walked an area north of the home, which is referred to as a meadow.

---

[8] However, there is no such requirement in BRRETA.

On July 31, 2008, the McGonigles entered into an exclusive buyer agency agreement with Brigman as their "designated agent."[9]   The exclusive agreement required Brigman to disclose all known adverse material facts to the McGonigles.  At some point, Jerry McGonigle went to the property by himself and met with Dan Rich.  They walked some of the property and discussed the additional acreage available to the south.  McGonigle asked about the ditches that were mowed and if Rich was required to mow those ditches.  Rich informed McGonigle that the City mowed the ditches.  Rich then told McGonigle about his agreement with the City and that it required the owner to maintain the dam.[10] There is no evidence, however, that Rich told McGonigle what it meant to "maintain" the dam or that the agreement was a written, recorded document.  This is significant because there is no question that Dan Rich knew that the 1981 agreement was very specific in terms of his maintenance obligation.  The court finds it reasonable to infer that Rich did not disclose the details of the maintenance obligation because they might discourage potential buyers.  Dan Rich did not disclose other problems with the house which, at one time, were part

---

[9] "Designated agent means a licensee affiliated with a broker who has been designated by the broker, or the broker's duly authorized representative, to act as the agent of a broker's buyer or seller client to the exclusion of all other affiliated licensees."  K.S.A. 58-30,102(k).

[10]  McGonigle denied being told about the agreement or an obligation to maintain the dam.  The court finds, however, the statement about dam maintenance was relayed to McGonigle.  Gilliland testified, and the court finds her testimony credible, that Rich called her after McGonigle's visit and relayed their discussions which included disclosing that there was an agreement to maintain the dam.

of the case.[11]

Prior to an offer being made, Gilliland met with Brigman to discuss the property. Gilliland and Brigman discussed the dam, drainage and septic issues. Gilliland told Brigman that there was an agreement concerning the property in which the City had agreed to pay for the dam and the Riches had agreed to maintain the dam. Gilliland does not recall if she specifically stated that the agreement was recorded. Brigman did not disclose the existence of the agreement to the McGonigles and does not recall the contents of the meeting he had with Gilliland. Both Gilliland and Brigman testified that they believed the agreement should have been disclosed to the McGonigles prior to closing.

On August 5, 2008, Brigman went over the disclosure with the McGonigles and prepared an offer for the property. The McGonigles offered $330,000 for the property and the additional 8.6 acres south of the home. The contract was accepted by the Riches but was contingent on the completion of a home inspection. The McGonigles, however, did not have an inspection of the land. The home inspection was completed by Brent Voran and the preparations toward closing continued.

On August 8, First American Title prepared a preliminary agreement to issue a title policy. The policy did not disclose the 1981 agreement. First American did not discover the existence of the agreement because its procedures only required the examiner to view

_____

[11] These claims were resolved between the McGonigles and the Riches by settlement. Therefore, the court will not discuss the expenditures incurred by the McGonigles in repairing their home.

recorded documents back to the date of the last issued policy on the property. Because the 1999 title commitment did not disclose the 1981 agreement, the 1981 agreement likewise was not disclosed in the 2008 title policy prior to closing.

Both Gilliland and Brigman reviewed the title documents prior to closing. Gilliland expected the agreement to appear on the title policy but did not take any action after receiving the title documents. On October 9, 2008, the McGonigles closed on the property. After moving into the home, numerous issues were discovered concerning the home. Also, the legal description of the land had been changed prior to closing and the McGonigles were not aware of the change.[12]

On December 17, 2008, Jerry McGonigle received a letter discussing a new residential development on a one acre parcel south of the dam. The McGonigles were very concerned with this potential development because they believed they had purchased this acre in the sale.[13] The McGonigles received a call from a neighbor who stated that the development would probably not proceed because of the integrity of the dam. Georgia McGonigle testified that this was the first time that they had knowledge of a dam on their property.[14] Jerry McGonigle

---

[12] This issue was also resolved by settlement.

[13] Ultimately, this land was deeded to the McGonigles in the settlement.

[14] The court finds as less than credible the McGonigles' testimony that they did not know about the existence of the dam until after purchasing the property. The photos taken at the time of the purchase show a rather large body of water, some might call a lake, some a pond, but its existence was important to the McGonigles. The photos show a large number of trees bordering the lake or pond. It may be that the McGonigles were unaware of the dam, as a dam, but clearly they knew or should have known the water was being confined. The court does accept the McGonigles' testimony that they were not

spoke with Brian Clennan, the city engineer, who told him that the plan would probably not be approved due to the current condition of the dam. Jerry McGonigle was surprised to learn that the dam was in poor condition. Jerry McGonigle went to the register of deeds office and searched the property records and located the 1981 agreement.

On January 8, 2009, Kim Feldkamp, a DWR engineer, met with Jerry McGonigle and Clennan at the dam. The inspection of the dam revealed that the principal spillway and outlet pipe were corroded. It was also apparent that the removal and cutting of trees required by the 1981 agreement was never completed. DWR suggested that the principal spillway and outlet pipe needed to be replaced. DWR was concerned about the brush and trees located on the dam and recommended that all brush be cleared and the smaller trees be cut to the ground. (Doc. 472).

After the inspection, Jerry McGonigle received various bids for work on the dam. The bids ranged from $300,000 to over one million. In late 2009, Jerry McGonigle hired Mitzner's Bobcat and Trenching to deepen the lake by three feet in an attempt to add more water storage area. He paid $26,250 to Mitzner's for the work.

On December 10, 2009, the McGonigles' counsel sent a demand letter to First American seeking reimbursement under the title policy as a result of the failure to disclose the 1981 agreement. The letter informed First American that the reconstruction of the dam would cost at least $850,000. The claim was denied in January 2010. On July 27,

---

aware of the agreement to maintain the dam. As explained later in this decision, it is not the dam, but the agreement, which is significant.

2010, the McGonigles' counsel sent a second letter reasserting their claim.

On August 10, 2010, Clennan sent a letter to Jerry McGonigle regarding the dam improvements.  He informed McGonigle that the City expected him to hire a professional engineer in order to complete a plan and specifications for work on the dam.  The City requested that the dam repairs include pumping the water out of the lake, the removal and replacement of the principal spillway, removal of all trees, regrading the embankment and establishing good vegetation cover.

On August 16, 2010, First American filed this action seeking a declaratory judgment that it did not have an obligation to pay for any loss under the policy.  First American named the McGonigles, the Riches and the City as defendants.  In response, the City sought specific performance from the Riches and the McGonigles concerning the 1981 agreement.  The McGonigles filed claims against First American, the Riches, Gilliland and Astle Realty.[15]

The parties obtained the services of MKEC Engineering Consultants to perform an inspection of the dam and make recommendations.  In August 2011, MKEC prepared a report which made three recommendations.  That report was forwarded to DWR.  In response, DWR issued a letter to Jerry McGonigle in October 2012.  DWR stated that the McGonigles could pursue any of the three recommendations in order to comply with Kansas law.  The first option maintains the structure as a jurisdictional Class C dam and requires

---

[15] In August 2012, the McGonigles filed an amended crossclaim and added a breach of contract and negligence claims against Brigman.
The claims against Astle are not independent but rather due to its relationship with Gilliland and Brigman as their employer.

a complete reconstruction of the dam, removal of trees and the root system, and improvements to the spillway.    The estimated cost is approximately $625,000.    The second option reduces the reservoir volume so that it is no longer a jurisdictional dam but instead is classified as a stream obstruction, which is defined as a structure having a drainage area of 320 acres of water.    This option calls for placing 8 acre feet of fill in the pond and removing the trees but not the root system.    The estimated cost is approximately $590,000.    The final option lowers the top of the dam by one to two feet, which changes the classification of the dam to a stream obstruction.    The trees and root system would be removed and a wave berm would be installed on the system.    The cost for the last option is approximately $564,000.

     At this time, DWR has not taken action against the McGonigles for failing to comply with Kansas law.    If the McGonigles do not comply with the October 2012 letter, DWR can take action by seeking an administrative order.

     On March 14, 2013, this court granted the City's unopposed motion for summary judgment.    (Doc. 159).   The City contended that its breach of contract claims against the McGonigles and the Riches were not actionable because Kansas law provides for DWR to have exclusive jurisdiction of all dams.    In other words, the City's agreement with the Riches was never enforceable.    First American moved for summary judgment on the basis that it could not breach its contract with the McGonigles for failing to disclose the 1981 agreement because the agreement is unenforceable.    First American further argued that it was not required to reimburse the McGonigles for any damages incurred in

-12-

bringing the dam into compliance with Kansas law because the title policy excludes damages due to compliance with laws and regulations. The court agreed and granted First American's motion for summary judgment.  (Doc. 159).

The court will now turn to its conclusions of law on the remaining claims in this case.

**III.  CONCLUSIONS OF LAW**

**A.  Fraud by Silence**

The McGonigles contend that Gilliland committed fraud by failing to disclose the existence of the dam and the agreement.  To establish fraudulent nondisclosure or fraud by silence, the McGonigles must show the following elements: (1) Gilliland had knowledge of material facts which the McGonigles did not have and which they could not have discovered by the exercise of reasonable diligence; (2) Gilliland was under an obligation to communicate the material facts to the McGonigles; (3) Gilliland intentionally failed to communicate the material facts to the McGonigles; (4) the McGonigles justifiably relied on Gilliland to communicate the material facts; and (5) the McGonigles sustained damages as a result of Gilliland's failure to communicate the material facts.  Kipp v. Myers, 753 F. Supp.2d 1102, 1107 (D. Kan. 2010)(citing Brennan v. Kunzle, 37 Kan. App.2d 365, 378 (2007)).  Fraud must be established by clear and convincing evidence. Alires v. McGehee, 277 Kan. 398, 403, 85 P.3d 1191 (2004).

The McGonigles did not establish by clear and convincing evidence any intentional omission of material facts by Gilliland.  The credible evidence at trial was that Rich informed Gilliland of the existence of the dam and the recorded agreement with the City in which

-13-

Rich agreed to maintain the dam.  There was no evidence that any further information was disclosed to Gilliland, i.e. what exactly was meant by "maintain."

Under the Brokerage Relationships in Real Estate Transactions Act (BRRETA), K.S.A. 58-30,101, et seq., a seller's agent[16] owes no duty to a buyer except to disclose all adverse material facts actually **known** by the agent, including environmental hazards, physical condition of the property, and material defects.  K.S.A. 58-30,106(d)(1)(emphasis supplied); Stechschulte v. Jennings, 298 P.3d 1083, 1099 (Kan. 2013).  Moreover, an agent has no duty to conduct an independent inspection of the property or to verify the accuracy or completeness of any statement by the seller.  K.S.A. 58-30,106(d)(2). Therefore, Gilliland had no duty to verify Rich's statement or to retrieve the document herself.  Gilliland's only duty was to "competently pass[] on what [was] known." Stechschulte, 298 P.3d at 1099.

Gilliland informed Brigman of the existence of the dam and agreement.  Gilliland also told Brigman that the agreement imposed a duty on the property owner to maintain the dam.  Pursuant to the Exclusive Agency Agreement signed by the McGonigles and Brigman, Brigman was acting as an agent for the McGonigles.  (Exh. 432)("BUYER retains and appoints BROKER as BUYER'S Exclusive Agent to assist BUYER in the procurement of property and to negotiate terms and conditions . . .")  Kansas law is clear that knowledge of an agent is equivalent to knowledge of the principal.  See City of Wichita v. U.S. Gypsum

---

[16] A transaction broker has the same obligations concerning disclosure of adverse material facts.  K.S.A. 58-30,113(b)(2)(F).

-14-

<u>Co.</u>, 828 F. Supp. 851, 867 (D. Kan. 1993)(citing <u>Conner v. Koch Oil</u> <u>Co.</u>, 245 Kan. 250, 254 (1989)("A principal is charged with the knowledge of an agent acting within the scope of his authority even though the knowledge is not communicated to the principal."))

Therefore, Gilliland did not omit any facts because she disclosed those facts to the McGonigles through their agent. Gilliland was not required to directly disclose the existence of the agreement to the McGonigles because she had disclosed its existence to Brigman.

Because the McGoingles have not established by clear and convincing evidence that Gilliland intentionally failed to communicate material facts, judgment is entered in favor of Gilliland on the McGonigles' fraud by silence claim against Gilliland and Astle.

**B.  Negligent Misrepresentation by Gilliland**

Next, the McGonigles claim Gilliland was negligent in failing to disclose adverse material facts to the McGonigles.  This claim fails for the same reasons that the McGonigles' fraud by silence claim fails.  Gilliland disclosed everything she knew concerning the dam and the agreement to the McGonigles' agent and therefore cannot be found to be negligent.

Judgment is therefore entered in favor of Gilliland and Astle on the McGonigles' negligence claim.

**C.  KCPA Violation**

The McGonigles final claim against Gilliand concerns a violation of the Kansas Consumer Protection Act (KCPA).  The KCPA provides that an "aggrieved consumer" may maintain a private right of action against a supplier if: (1) the supplier willfully failed to state a material

fact; or (2) the supplier willfully failed to state, concealed, suppressed, or omitted a material fact. See K.S.A. 50-626(b)(3); K.S.A. 50-634(a). Because the McGonigles cannot prove that Gilliland willfully failed to state a material fact or concealed a material fact, judgment is entered in favor of Gilliland and Astle on this claim.

### D. Breach of Contract against Brigman

The McGonigles contend that Brigman breached the exclusive buyer's agreement by failing to disclose the existence of the dam and the 1981 agreement. The elements of a breach of contract are: (1) the existence of a contract; (2) sufficient consideration; (3) the McGonigles' performance in compliance with the contract; (4) Brigman's breach of the contract; and (5) damages to the McGonigles caused by the breach. Stechschulte v. Jennings, 298 P.3d 1083, 1099 (Kan. 2013). The first three elements have been met by a preponderance of the evidence. There was a written contract between Brigman and the McGonigles. The contract required that Brigman act as the McGonigles' designated agent in exchange for a fee. The McGonigles complied with their duties under the contract and Brigman received a fee after the closing.

### 1. Breach

Turning to the fourth element, the McGonigles claim that Brigman breached his agreement to disclose the existence of the dam and the agreement. Paragraph 4(C) of the Exclusive Agency Agreement states that the "BROKER will disclose to BUYER all adverse material facts actually known by BROKER. . ." (Exh. 432). To establish Brigman breached this provision, the McGonigles must show that Brigman knew

-16-

of the dam and/or the agreement and that those facts were adverse and material.  Brigman testified that he knew there was some kind of structure on the property but was not aware of what it was.  He referred to it as an embankment and discussed it with Jerry McGonigle. Brigman did not recall meeting with Gilliland and her disclosure of the dam and the agreement.

The court finds Gilliland's testimony to be credible that she disclosed the dam and the agreement to Brigman.[17]  There is no dispute that Brigman did not disclose the existence of the 1981 agreement to the McGonigles.  The court must first find, however, that the fact of the dam and the agreement were adverse and material.  This requires separate consideration of the dam and the agreement.

The Exclusive Agency Agreement does not define adverse material facts but does refer to Brigman's obligations pursuant to BRRETA. BRRETA requires agents to disclose any adverse material facts actually known by the agent, including environmental hazards, physical condition of the property, and material defects.  K.S.A. 58-30,106(d)(1).  The statutory list is not exhaustive.

There was no evidence at trial that the presence of a dam, standing alone, is an adverse material fact.  Gilliland and Brigman both testified that the dam or structure was out in the open and that

---

[17]  The discrepancy between Gilliland and Brigman's testimony regarding disclosure and the court's acceptance of Gilliland's testimony must not be interpreted as a finding that Brigman lied. In every jury trial the court instructs that "when weighing conflicting testimony you should consider whether the discrepancy has to do with a material fact or with an unimportant detail, and should keep in mind that innocent misrecollection -- like failure recollection -- is not uncommon."  The court accepts that Brigman simply failed to recall the conversation.

a disclosure was not necessary.  Without any evidence that a dam, in and of itself, would somehow be adverse to a property owner, the court cannot find that the existence of the Panorama Dam was an adverse fact requiring disclosure.  Moreover, the McGonigles did not testify that the existence of the dam was material to their purchase, i.e. that they would not have purchased the property if they had known that there was a dam.  Rather, the McGonigles testified that their post-purchase knowledge of the extensive work required on that particular dam would have been material to their decision.  That knowledge was provided in the 1981 agreement.  Therefore, judgment must be entered in favor of Brigman on the McGonigles' claim of breach of contract due to Brigman's failure to disclose the dam.

The existence of the 1981 agreement is a much different matter. Brigman was told that the Riches had an agreement with the City to maintain the dam.  Brigman did not relay that information to the McGonigles.  Both Brigman and Gilliland testified that the McGonigles should have been told about the existence of the agreement.  The court agrees.  An agreement which imposes a duty on the property owner is an adverse fact.  The 1981 agreement requires the property owners do more than just cut grass.  It imposes a duty on them to remove trees, root systems of small trees and poison the stump of larger trees on the dam.  BRRETA does not require Brigman to investigate the existence of the agreement and its details.  It does, however, require Brigman to relay the information learned in his conversation with Gilliland. Moreover, the existence of the 1981 agreement was material because the McGonigles testified that they would have not purchased the property had they known of the tremendous expense of maintaining the dam.  The

-18-

court accepts this testimony.

Therefore, the court finds that the McGonigles have established that Brigman breached the buyer's agreement by failing to disclose the existence of the 1981 agreement.

### 2. Damages

The fifth element requires the McGonigles to have incurred damages as a result of the breach. The McGonigles contend that they have suffered the following damages: 1) an amount to bring the dam in compliance with Kansas law; 2) wages of Tony Law; 3) $26,250 paid to Mitzner's to add fill to the lake and 4) loss of use of the property.

Kansas law limits recovery of damages as a result of a breach of contract to "those damages which may fairly be considered as arising in the usual course of things, from the breach itself, or as may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach." Kansas State Bank v. Overseas Motosport, Inc., 222 Kan. 26, 27, 563 P.2d 414 (1977). Therefore, the McGonigles "were required to prove either that the damages arose in the usual course of things, from the breach itself, or that the damages were within the contemplation of the parties." Royal College Shop, Inc. v. N. Ins. Co. of N.Y., 895 F.2d 670, 679 (10th Cir. 1990). A party may not recover damages that are not the proximate result of the breach or that are "remote, contingent, or speculative in character." Id.

Turning to the first claim, the McGonigles seek damages to repair the dam and bring it into compliance with Kansas law. Greg Allison, a civil engineer with MKEC, introduced a report establishing the breakdown of costs associated with bringing the dam into

-19-

compliance.   The costs for each option outlined by MKEC are not in dispute and range from $563,000 to $624,770.   (Exh. 493).   The question becomes whether the McGonigles have established that the cost to repair the dam embankment or rebuild the structure to change the classification to a stream obstruction can "fairly be considered as arising, in the usual course of things, from the breach" of the buyer's agreement.[18]

The McGonigles established that Brigman breached the agency agreement for failing to disclose the existence of the 1981 agreement requiring that the dam be maintained by the property owners.   There is no evidence that Brigman, or Gilliland for that matter, knew that the dam was not in compliance with Kansas law or the terms of the 1981 agreement.   The evidence was that Rich told Gilliland that he had to maintain the dam.   The 1981 agreement required the Riches to remove trees under six inches and cut trees larger than six inches and poison the stump.   There is no additional obligation concerning the maintenance of the primary or auxiliary spillway, the need for additional permits or payment of engineering expenses.   Even if Brigman had disclosed the existence of the 1981 agreement, there is no evidence that the McGonigles would have known that the dam needed such additional extensive work.

Damages are to place the nonbreaching party in the position it would have been in had the breach never occurred, "without allowing that party a windfall." State ex rel. Stovall v. Reliance Ins. Co., 278 Kan. 777, 789 (2005).   Awarding damages to the McGonigles in the

---

[18] There is no evidence that these damages were within the contemplation of the parties.

amount of $624,770 would be a windfall. Brigman failed to disclose an agreement to maintain the dam, i.e. remove brush and vegetation, not that the entire dam was in danger of failing and needed to be entirely rebuilt. The court finds that awarding damages in the amount that it would cost to rebuild the dam would not be fair and would result in allowing the McGonigles a windfall. However, the court does find that an award of damages in the amount to remove the trees is fair and adequate and will place the McGonigles in the position they would have been had the breach never occurred. The cost to remove the trees is $202,500. (Exh. 493 at 21). This amount has been proven by the McGonigles by undisputed evidence and is not remote, contingent, or speculative.

Turning to the second claim, the McGonigles seek damages for the wages of Jerry McGonigle's employee, Tony Law. The McGonigles have not established that the wages of Law arise from the breach of the buyer's agreement or shown a reasonable basis for the computation of those damages. English Village Properties, Inc. v. Boettcher & Lieurance Constr. Co., 7 Kan. App.2d 307, 310–11, rev. denied 231 Kan. 799 (1982). Jerry McGonigle testified that Law performed work that he could not perform because he was investigating the issues with the dam. Jerry McGonigle paid Law wages for 735 hours of work. Jerry McGonigle did not establish his actions during those 735 hours or that his activities during that time arose from the breach. Therefore, the court finds that the damages incurred in paying Law's wages are remote and speculative.

Next, the McGonigles seek damages to reimburse the $26,250 paid to Mitzner's to excavate the lake. McGonigle testified that he had

this work done because he felt he had to do something.  There is no evidence, however, that this work was necessary to repair the dam or to comply with the 1981 agreement.  Therefore, these damages do not arise from the breach of the buyer's agreement.

Finally, the McGonigles seek $100,000 for their loss of use of the property.  The McGonigles, however, have not proven these damages. There is no evidence that they have lost the use of their property. The only evidence at trial concerning the loss of use was that the sight of the dam is distressing to them.  Emotional damages are not recoverable in a contract action because they are speculative in nature.  See Woodmen Acc. & Life Ins. Co. v. Bryant, 784 F.2d 1052, 1056-57 (10th Cir. 1986)(citing Restatement (Second) of Contracts § 353 (1981)).  Therefore, the claim for damages relating for loss of use is denied.

Judgment on the McGonigles' claim for breach of contract is entered in favor of the McGonigles and against both Brigman and Astle Realty, as Brigman's employer, in the amount of $202,500.  The McGonigles also seek reimbursement of attorney's fees as allowed by the contract.  (Exh. 432 at 3).  The McGonigles may submit a motion for fees by August 15, 2013.  Any objection to the fees must by filed by August 29.

### E. Negligence by Brigman

The McGonigles also assert that Brigman was negligent for failing to disclose the existence of the dam and the agreement. Brigman contends that this claim is barred by the statute of limitations.  K.S.A. 60-513(a) sets out a two year statute of limitations for negligence.  "The statute of limitations starts to run

in a tort action at the time a negligent act causes injury if both the act and the resulting injury are reasonably ascertainable by the injured person." <u>Moon v. City of Lawrence</u>, 267 Kan. 720, 727, 982 P.2d 388, 394 (1999). "In other words, a plaintiff . . . must file his or her action within two years of discovering the [negligence] if he or she suffered an ascertainable injury at that time." <u>Evolution, Inc. v. SunTrust Bank</u>, 342 F. Supp. 2d 964, 972 (D. Kan. 2004).

In <u>Bradley v. Val-Mejias</u>, 379 F.3d 892, 898 (10th Cir. 2004), the Tenth Circuit stated that the "phrase 'reasonably ascertainable' means that a plaintiff has the obligation to reasonably investigate available sources that contain the facts of the [injury] and its wrongful causation." (citing <u>Davidson v. Denning</u>, 259 Kan. 659, 914 P.2d 936, 948 (1996)).

The McGonigles discovered the existence of the 1981 agreement in February 2009 but did not move to amend their complaint until June 29, 2012. In October 2009, the McGonigles retained counsel who then sent a demand letter to First American on December 10, 2009. In the letter, the McGonigles' counsel stated that the title company failed to disclose the recorded agreement, the Riches also failed to disclose the agreement and that the cost to repair the dam would be $850,000. Therefore, the letter clearly shows that the McGonigles were aware of a failure to disclose on the part of the title company and, potentially, the Riches, in December 2009.

The McGonigles claim that they were not aware of Brigman's failure to disclose until Gilliland's deposition, which occurred in 2012. There was no evidence, however, that the McGonigles attempted to discover who or what other entity was involved in the failure to

disclose the agreement at the time that they discovered the injury in late 2009. There is also no evidence of concealment by Brigman. Based on Gilliland's testimony and her deposition, the McGonigles would have discovered the knowledge of Brigman's involvement had they taken time to investigate and/or speak with Gilliland. Because the McGonigles did not reasonably investigate the facts surrounding the failure to disclose, the court finds that the statute of limitations on their claim began to run, at the latest, on December 10, 2009. Therefore, the McGonigles negligence claim against Brigman should have been filed by December 10, 2011, and it was not.

The McGonigles' negligence claim against Brigman is accordingly barred by the statute of limitations. Judgment is entered in favor of Brigman and Astle Realty on this claim.

## IV.   CONCLUSION[19]

Judgment is entered in favor of Gilliland and Astle Realty on the McGonigles' claims of fraud, negligent misrepresentation and a violation of the KCPA. Judgment is entered in favor of Brigman and Astle Realty on the McGonigles' claim of negligent misrepresentation. Judgment is entered in favor of the McGonigles' on their claim against Brigman and Astle Realty for breach of contract in the amount of $202,500. The McGonigles may submit a motion for attorney's fees by August 15, 2013. Any objection to the fees must by filed by August 29.

---

[19] The following motions are termed as a result of this memorandum decision: Brigman's motion for summary judgment (Doc. 122), motion in limine (Doc. 158) and motion to strike the supplemental witness disclosure (Doc. 168); and Gilliland's motion for partial summary judgment (Doc. 163).

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 5 double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F. Supp. 1172, 1174 (1992).  The response to any motion for reconsideration shall not exceed 5 double-spaced pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this   22nd   day of July 2013, at Wichita, Kansas.


 s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE